# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### COLUMBIA DIVISION

| | | |
|---|---|---|
| RANDALL MILLS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 1:14-cv-00150 |
| v. | ) | Senior Judge Haynes |
| | ) | |
| WEAKLEY E. BARNARD, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM

Plaintiff, Randall Mills, filed this action under 42 U.S.C. §§ 1981, 1983, and 1985 and their

jurisdictional counterparts 28 U.S.C. §§ 1331 and 1343(a) against the Defendants: Weakley Barnard,

Sharon Jenkins, and Beth Rhoton in their individual and official capacities; Mark Gwyn in his

official capacity; Marshall County; and the City of Lewisburg. This action arises from Plaintiff's

wrongful convictions in January 2000 that were set aside in November 2013 for a new trial by the

Tennessee Court of Criminal Appeals on the basis of new DNA evidence.

Plaintiff contends, in sum: (1) that Defendants subjected him to malicious prosecution and

wrongful conviction and conspired to hide the truth in violation of the Fourth, Thirteenth, and

Fourteenth Amendments; (2) that Defendants Barnard, Jenkins, and Rhoton conspired to deprive

Plaintiff of his rights under the First, Fourth, and Fourteenth Amendments, including his right to be

free from unreasonable arrest and seizure, wrongful imprisonment, malicious prosecution, and access

to courts and deprived him of equal protection of the laws under the Fourteenth Amendment and §§

1983 and 1985; and (3) that Defendants Marshall County and the City of Lewisburg are liable

because Barnard, as their final policymaker, authorized the unlawful conduct to prosecute Plaintiff

even after exculpatory evidence was fully revealed. Plaintiff also asserts a Tennessee state law claim

for false imprisonment against Defendants Barnard and Jenkins. Plaintiff seeks monetary damages as well as declaratory and injunctive relief.

Before the Court are the following motions: Defendants Jenkins's and Gwyn's motion to dismiss (Docket Entry No. 6); Defendant Barnard's motion to dismiss (Docket Entry No. 13); Defendant Marshall County's motion to dismiss (Docket Entry No. 16); and Defendants Rhoton's and the City of Lewisburg's motion to dismiss (Docket Entry No. 18).

In their motion, Defendants Jenkins and Gwyn assert, in essence: (1) that Plaintiff's claims for money damages against Defendants Jenkins and Gwyn in their official capacities are barred by the Eleventh Amendment and because they are not "persons" under 42 U.S.C. § 1983; (2) that Plaintiff's allegations on his malicious prosecution and "wrongful conviction" claims fail to establish a lack of probable cause to prosecute and fail to establish that Defendant Jenkins participated in the decision to prosecute; (3) that Plaintiff does not allege the race-based discrimination required for a Thirteenth Amendment claim; (4) that Plaintiff fails to plead his §§ 1983 and 1985 conspiracy claims with requisite specificity and fails to allege racial animus for his § 1983 conspiracy claim; (5) that Plaintiff fails to allege that similarly situated persons were treated differently; (6) that the statute of limitations bars Plaintiff's claims for false arrest, false imprisonment, and assault; (7) that Plaintiff's allegations fail to establish that Defendants Jenkins and Gwyn impaired Plaintiff's ability to file his claims; (8) that declaratory judgment would not resolve any issues in this case; and (9) that Plaintiff cannot demonstrate immediate irreparable harm necessary for his injunctive relief claim.

In his motion, Defendant Barnard asserts: (1) that Plaintiff's claims for money damages against him in his individual capacity are barred by absolute prosecutorial immunity; (2) that Plaintiff's claims for money damages against Defendant Barnard in his official capacity are barred

by the Eleventh Amendment and because he is not a "person" under 42 U.S.C. § 1983; and (3) that there is no basis for seeking declaratory or injunctive relief.

In its motion, Defendant Marshall County asserts: (1) that Plaintiff improperly named Marshall County as a Defendant based on the erroneous premise that Marshall County employed the individual Defendants in this action; and (2) that Plaintiff's allegations do not establish a constitutional deprivation and thus, Marshall County cannot be liable.

In their motion, Defendants Rhoton and the City of Lewisburg assert: (1) that Plaintiff fails to allege the race-based discrimination required for his Thirteenth Amendment claim; (2) that Plaintiff's claims for false arrest, seizure, unlawful detention, and false imprisonment are barred by the one year statute of limitations; (3) that Plaintiff fails to plead his §§ 1983 and 1985 conspiracy claims with specificity; (4) that Plaintiff fails to allege that he was deprived access to the courts by these Defendants; (5) that Plaintiff's allegations on his malicious prosecution claim fail to challenge the probable cause to prosecute and identify Defendant Rhoton as a participant in the decision to prosecute; (6) that Defendant Rhoton is entitled to qualified immunity; (7) that Plaintiff's allegations fail to establish that the City of Lewisburg is responsible for the actions of Defendant Barnard; (8) that Plaintiff fails to allege a constitutional deprivation and thus, the City of Lewisburg cannot be liable; and (9) that Plaintiff fails to allege that any City of Lewisburg policy, practice, procedure, or custom was the driving force behind the alleged constitutional violations.

In his consolidated response, Plaintiff argues, in sum: (1) that none of his claims is barred by the applicable statutes of limitation; (2) that Defendants Barnard, Jenkins, Rhoton, and Gwyn are properly named in their official capacities due to Plaintiff's requests for declaratory and injunctive relief and that Plaintiff has sufficiently alleged the criteria for declaratory and injunctive relief; (3)

3

that Defendant Jenkins influenced the decision to prosecute and helped to establish probable cause with her "false" DNA report and testimony; (4) that Plaintiff sufficiently alleges the elements of his malicious prosecution claim against Defendant Barnard based on Barnard's "coerc[ing] false and fabricated testimony and withh[olding] a great deal of exculpatory evidence"; (5) that Plaintiff's allegations establish a valid claim for discrimination as a "class of one" under the Equal Protection Clause of the Fourteenth Amendment and § 1983; (6) that Plaintiff's allegations state viable claims for conspiracy under §§ 1983 and 1985(3) as a "class of one" based on each Defendant's specific illegal conduct in falsely asserting Plaintiff's guilt; (7) that Plaintiff sufficiently alleges that the Defendants deprived Plaintiff of his ability to use the court system to assert his rights; (8) that based on his allegations, Defendants Jenkins, Gwyn, Rhoton, the City of Lewisburg, and Marshall County are not entitled to qualified immunity; (9) that based on his allegations, Defendant Barnard is not entitled to absolute prosecutorial immunity; and (10) that his allegations establish that the City of Lewisburg and Marshall County are properly named defendants that "permit[ted] and encourage[d] Barnard and those reporting to him [to] engage in the course of conduct that led to the deprivation of Plaintiff's rights." In his consolidated response, Plaintiff concedes dismissal of his discrimination claim under the Thirteenth Amendment and 42 U.S.C. § 1981, as Plaintiff does not allege race-based discrimination.

For the reasons set forth below, the Court concludes that Defendants' motions to dismiss should be granted. The Court concludes that Plaintiff's Fourth Amendment false arrest/false imprisonment claim is barred by the applicable one-year statute of limitations because these claims began to accrue in 1999. Plaintiff's official capacity claims for money damages against Defendants Jenkins, Gwyn, and Barnard are barred by the Eleventh Amendment because these Defendants were

state officials. Because all of Defendant Barnard's alleged acts were closely related to his role as an advocate for the State, Defendant Barnard is entitled to absolute prosecutorial immunity for all of the alleged misconduct that provides the bases for Plaintiff's claims against Barnard. Plaintiff's Fourth Amendment malicious prosecution claims should be dismissed because the victim's oral and signed statements and the grand jury indictments supplied probable cause to prosecute Plaintiff. Based upon the state appellate court findings, Plaintiff's <u>Brady</u> claim fails because the new DNA evidence was based on sperm material and additional DNA material that Defendant Jenkins did not possess or test. Plaintiff's equal protection claim should be dismissed because he fails to allege that he was treated differently from persons similarly situated in all material respects. Plaintiff's §§ 1983 and 1985(3) conspiracy claims should be dismissed because Plaintiff has not established an underlying constitutional injury and Plaintiff fails to allege with specificity any plausible facts of an agreement to engage in unlawful action. Plaintiff's access-to-courts claim should be dismissed because Plaintiff does not allege any of the elements necessary for a backward-looking denial of access-to-court claim. Moreover, where, as here, Plaintiff has viable state law remedies, the Fourteenth Amendment due process claims fail to state a claim. Plaintiff's municipal liability claims against Defendants Marshall County and the City of Lewisburg should be dismissed because Defendant Barnard, the lead prosecutor, was a state official. Likewise, given his state remedies, Plaintiff's requests for declaratory and injunctive relief should be denied.

## A. Analysis of the Complaint

### 1. Background

On the evening of March 15, 1999, Plaintiff's twelve-year-old neighbor CM[1] snuck out of her mother's house while her mother was away. (Docket Entry No. 1, Complaint, at ¶ 12). CM's sister, Jennifer, and Jennifer's boyfriend, Robert Hodge, noticed CM's absence and drove around the neighborhood to look for her. Id. at ¶ 13. Jennifer and Hodge found CM disoriented on the front doorstep when they came home. Id. CM initially told Jennifer that she had been in the back yard, but when Jennifer informed CM that she had looked in the back yard, CM told Jennifer that Plaintiff gave her marijuana and sexually fondled her. Id. at ¶ 14. Jennifer and Hodge then "barged into" Plaintiff's living room where Plaintiff was watching television with his two teenage sons and accused Plaintiff of molesting and sharing drugs with CM. Id. at ¶ 23. Plaintiff turned himself over to the Lewisburg police department. Id. at ¶ 26.

On March 18, 1999, Plaintiff was indicted for providing drugs to a minor and engaging in digital and oral sexual contact with a minor. Id. at ¶¶ 26-27. In August 1999[2], a DNA report from the Tennessee Bureau of Investigation ("TBI") found that there was semen in CM's underwear. Id. at ¶ 35. Lewisburg police investigator Beth Rhoton approached CM with this information and obtained a signed statement from CM that Plaintiff also engaged in penile intercourse with her. Id.

---

[1]Parties refer to the accuser in Plaintiff's underlying criminal case as "CM" and her sister as "Jennifer" because they were minors at the time of trial.

[2]Because Plaintiff's allegations in his complaint are ambiguous on the important issue of the role of the DNA test in the filing of the second indictment and whether the report used by Rhoton for this inference was Jenkins's DNA report, the Court deems it necessary to take judicial notice of its records on the actual timing of the DNA report. Courts can take judicial notice of its records. J.P. Silverton Indus. L.P. v. Sohm, 243 F.App'x 82, 87 (6th Cir. 2007).

at ¶¶ 6, 19, 36-37. CM stated that she did not report the penile intercourse earlier because she was afraid of getting into trouble. Id. at ¶ 37. On August 18, 1999, Plaintiff was indicted for an additional charge of rape of a child through penile penetration. Id. at ¶ 38. On August 18, 1999, the State court ordered the collection of blood and saliva samples from Plaintiff. See Mills v. Bell., 1:05-cv-00083 (M.D. Tenn.) (Docket Entry No. 33-1 at 39, August 18, 1999 State court order granting motion to collect blood and saliva samples of Randall Mills).

On January 25, 2000, a jury found Plaintiff guilty of rape of a child, aggravated sexual battery, and casual exchange. (Docket Entry No. 1 at ¶¶ 54-55). Plaintiff was sentenced to serve twenty years in Riverbend Maximum Security Prison. Id. at ¶ 55. In 2003, Plaintiff unsuccessfully appealed his convictions in state court. Id. at ¶¶ 58-59. Plaintiff then sent a habeas corpus petition to the Federal Public Defender for the Middle District of Tennessee. Id. at ¶ 60. The Federal Public Defender's office, in conjunction with the Innocence Project, sent the preserved DNA evidence from Plaintiff's trial to SERI, a private DNA laboratory. Id. SERI analysts found semen from two different male contributors in CM's underpants and concluded that Plaintiff was not the contributor of either semen stain. Id. at ¶ 61.

On April 20, 2011, Plaintiff filed a petition for writ of error coram nobis in state court, and Plaintiff's conviction for rape of a child through penile penetration was dismissed on the basis of the new DNA evidence. Id. at ¶¶ 1, 65, 68. The State court approved a release agreement between Plaintiff and Defendant-prosecutor Weakley Barnard that allowed Plaintiff a reduced sentence, amounting to time served for the drug and non-penile rape convictions, in exchange for Plaintiff's release of claims. Id. at ¶¶ 1, 69, 72. On April 26, 2011, Plaintiff was released and registered as a sexual offender because of his remaining conviction for aggravated sexual battery. Id. at ¶¶ 1, 72,

73.

On November 19, 2013, the Tennessee Court of Criminal Appeals granted Plaintiff a new

trial for all remaining claims, ruling that SERI's new DNA evidence called into question not just the

penile penetration claim, but all of the charged offenses. Id. at ¶ 1, 81; Mills v. State, No. M2011-

00620-CCA-R3-PC, 2013 WL 6069276, at **1, 25 (Tenn. Crim. App. Nov. 19, 2013). After an

extensive review of the record, the Tennessee appellate court made the following findings[3]:

> During the evidentiary hearings, the trial court evaluated the veracity of SERI's new
> DNA results and compared them with Jenkins's DNA results from the Petitioner's
> trial. The court also heard testimony from Agent Minor, the technical manager for the
> TBI's DNA division. Harmor testified that SERI's results showed that the Petitioner
> was excluded from the male DNA from unit 1–1, the sample from the waistband of
> the victim's underwear, and was excluded from the male DNA on unit 1–2, the
> sample from the crotch of the victim's underwear. He noted that he was able to
> identify more genetic material on the underwear than Jenkins. He also noted that
> Jenkins only drew "conclusions about the epithelial or non-sperm fraction of the
> crotch of the pair of panties and not the sperm fraction." Harmon stated that he would
> have included the conclusions regarding the sperm fraction "to give a more complete
> result of the analysis." Regarding the one marker that Jenkins asserted could have
> been contributed by the Petitioner, Harmon stated, "I would prefer to have looked at
> the electronic data and then analyzed it myself, with spreading the scale out, so that
> I could see what the peaks themselves looked like, to make sure they weren't
> artifacts." Finally, he opined that Jenkins had mistakenly identified the Petitioner's
> known sample as a 13, 14 rather than a 13, 13 at the D8S1179 locus and asserted that
> he had two results showing that the Petitioner was a 13, 13 at that locus.
>
> At the evidentiary hearing, Jenkins testified that during the Petitioner's trial she
> concluded that at the locus of TH01, in the non-sperm fraction, she found alleles 5,
> 9, which were both consistent with the Petitioner's known sample at that locus. She
> further concluded at trial that an unrelated individual having the same DNA profile
> from the African–American population was 1 in 270 and in the Caucasian population
> was 1 in 290. She confirmed that her current testimony was the same as at the

---

[3] Because the Tennessee appellate court opinion is cited in Plaintiff's complaint and
attached to the motions to dismiss of Defendant Jenkins (Docket Entry No. 6) and Defendant
Barnard (Docket Entry No. 13), the Court can consider this material on a motion to dismiss and
such consideration does not convert the pending motions to dismiss into motions for summary
judgment. Rodic v. Thistledown Racing Club, Inc., 615 F.2d 736, 738 (6th Cir. 1980).

Petitioner's trial, namely that she was unable to rule the Petitioner out at the TH01 locus. Jenkins stated that when she lowered the baseline to between 50 and 150 RFU, she found no sperm fraction on the crotch area or the waistband area of the underwear at the TH01 locus. Although she acknowledged that SERI found an allele number 8 on the sperm fraction of the waistband in item 1–1 and the sperm fraction of the crotch of the panties in item 1–4, she stated that she was unable to find an 8 there. She explained that the difference could be because of the "technology, the sensitivity of their instruments" or because they may have been able to find something different because they had a different cutting or because of contamination. She said that after dropping the baseline, she still could not exclude the Petitioner at the locus TH01. Jenkins acknowledged that SERI found in the area D135317 alleles 12, 14 in item 1–1 that were male. She stated that SERI used these alleles to exclude the Petitioner because his known markers at that location were 8, 12. In addition, she noted that SERI found a 12, 14 in the sperm fraction for item 1–2 as male, which SERI used to exclude the Petitioner because his known markers at that location are 8, 12. In area D165539, SERI found alleles 9, 11 in item 1–2, which SERI used to exclude the Petitioner because his known markers at this location were 10, 13. Jenkins denied mistyping the Petitioner as a 13, 14 at the D8S1179 locus. She acknowledged that her testing produced very little DNA despite the fact that she had identified sperm and semen on the victim's underwear and that SERI's testing produced substantially more DNA in the non-sperm and sperm fractions in units 1–1 and 1–4. She also acknowledged that when she tested the underwear in 1999, she identified a lot of alleles that excluded the Petitioner, but she did not call them because she deemed them inconclusive. Jenkins said that after reviewing SERI's reports and data and after conducting additional analysis of her data, she stated that there was nothing that would change the testimony she gave at the Petitioner's trial.

Agent Minor also testified at the evidentiary hearings. He stated that based on his review of SERI's report, there was nothing in SERI's findings with which he disagreed. However, he said that he had not reviewed SERI's raw data to ensure that it supported SERI's conclusions. He noted that he had some problems with the wording of SERI's conclusions in its reports and that contamination of the evidence could explain why SERI's findings were different from TBI's findings. Agent Minor stated that he, like SERI, identified the Petitioner's known sample as a 13, 13 at the D8S1179 locus, even though Jenkins identified the Petitioner as a 13, 14 at that locus. After considering the evidence from the coram nobis hearing and the evidence presented at trial, the court granted the Petitioner a new trial on count 2.

First, the Petitioner argues that SERI's exculpatory DNA evidence undermines the victim's testimony as to all of the charged counts, not just the charge of rape of a child-penile penetration. He claims that this court on direct and post-conviction appeal held that Jenkins's "incriminating DNA evidence bolstered and corroborated [the victim's] *entire* testimony" and that "the new exculpatory DNA evidence

eviscerates [the victim's] *entire* testimony." He asserts that "the new exculpatory DNA evidence casts substantial doubt on *all of* [the victim's] trial testimony—not just her penile penetration testimony" and "[h]ad the jury known of the exculpatory DNA evidence, [it] *may have* acquitted Mills" of the remaining counts.

We believe the new DNA evidence casts at least some doubt on the accuracy of Jenkins's results and calls into question not only whether the Petitioner committed the offense of rape of a child—penile penetration but also whether the Petitioner committed any of the charged offenses. On direct appeal, this court recognized that the victim's testimony "constituted the bulk of the evidence against the defendant at trial" and that Jenkins's testimony that semen and sperm were found on the victim's underwear corroborated the victim's testimony. Interestingly, Jenkins['s] testimony at trial was that she found alleles 5, 9 at the locus TH01 that were consistent with the Petitioner and that the probability in an unrelated individual having the same DNA profile from the African/American population was 1 in 270 and in the Caucasian population was 1 in 290. However, the alleles that Jenkins stated were consistent with the Petitioner were found in the non-sperm fraction of the sample, rather than the sperm fraction of the sample. Moreover, Harmor stated that SERI was able to identify more genetic material on the underwear than Jenkins and that SERI's results showed that the Petitioner was excluded from the male DNA from unit 1–1, the sample from the waistband of the victim's underwear, and was excluded from the male DNA on unit 1–2, the sample from the crotch of the victim's underwear. We agree with the Petitioner that the new DNA evidence undermines the victim's credibility not just as to the child rape—penile penetration charge but also as to all the charges for which the Petitioner was convicted. Consequently, we hold that a reasonable basis exists for concluding that had the new DNA evidence been presented at trial, the result of the proceedings on all of the charges might have been different.

Mills v. State, 2013 WL 6069276, at **23-25 (emphasis added). The Tennessee appellate court's

decision led to Plaintiff's deregistration as a sex offender and overturned the lower court's approval

of the release of claims. (Docket Entry No. 1 at ¶¶ 1, 81). On March 4, 2014, Plaintiff filed a

corrected motion to dismiss the indictment based on State's misconduct, and Defendant Barnard

filed a nolle prosequi motion. Id. at ¶¶ 83-84. On April 4, 2014, the Tennessee Circuit Court entered

a nolle prosequi order regarding the State's case against Plaintiff. Id. at ¶ 85. Plaintiff alleges that

a "basic background check . . . still indicates that he was convicted of rape of a child, aggravated

sexual battery, and casual exchange . . . ." Id. at ¶ 86.

In addition to the DNA evidence, Plaintiff alleges that CM later told her sister Jennifer that she lied about the accusations against Plaintiff. Id. at ¶ 15. Plaintiff also alleges that CM "significantly changed her account of the events every time it has been given," and made inconsistent statements regarding whether she entered Plaintiff's bedroom willingly, whether Plaintiff gave her Valium, and whether Plaintiff had penile intercourse with her. Id. at ¶¶ 15-16, 18-19. According to CM, the drug use and sexual contact occurred "a few feet away from a room occupied by Mills's two teenage sons." Id. at ¶ 21. CM testified at trial that she was a virgin prior to her alleged sexual encounter with Plaintiff. Id. at ¶ 39.

### 2. Allegations Against Defendant Barnard

Plaintiff alleges that Defendant Weakley Barnard, the Marshall County Assistant District Attorney who investigated and prosecuted Plaintiff, withheld evidence from Plaintiff's trial attorney, including the "actually exculpatory" DNA results that showed the semen on CM's underwear was not Plaintiff's, but two different men's. Id. at ¶¶ 3, 46, 49, 56. Plaintiff also alleges that Barnard did not investigate at least two other adult males, including Jennifer's adult boyfriend Robert Hodge, and a registered sexual offender living near CM's house. Id. at ¶¶ 42, 45. Barnard allegedly knew that Hodge and Jennifer, who was at the time a minor, were in a sexual relationship, but elicited testimony at trial to present their relationship as nonsexual. Id. at ¶¶ 42-43. Hodge was later convicted of crimes related to sexual acts with a minor. Id. at ¶ 44.

Plaintiff alleges that, during Plaintiff's 2003 state court appeal, Barnard elicited "false, logically impossible, and legally inadmissible testimony" from Plaintiff's defense attorneys that Plaintiff admitted guilt for all, but the penile intercourse charge. Id. at ¶ 58. Plaintiff also alleges that

11

Barnard undermined Jennifer's testimony that CM admitted to lying about what happened on the date of the alleged incident. Id. at ¶ 59. During Plaintiff's coram nobis action, Plaintiff alleges that Barnard "overzealously maintained that some unidentifiable men had masturbated and then handled the stained portions of CM's underwear while it was being preserved in a state evidence facility or being transferred via controlled protocol to SERI." Id. at ¶ 65. Barnard further proffered Plaintiff's defense attorneys' allegedly false testimony to support Plaintiff's convictions on the non-penile rape and drug offenses. Id. at ¶ 66. Citing CM's 2013 affidavit, Plaintiff alleges that Barnard threatened CM with legal consequences unless she testified as to Plaintiff's guilt. Id. at ¶¶ 15, 67, 79.

Plaintiff alleges that Barnard was the final policymaker responsible for the actions of his subordinate employees in the Marshall County District Attorney's Office and those who investigated the underlying incident. Id. at ¶ 3. Plaintiff further alleges that Barnard "acted in an administrative capacity with respect to certain matters alleged" in his complaint. Id. at ¶ 3.

### 3. Allegations Against Defendants Jenkins and Gwyn

Defendant Sharon Jenkins, the DNA analyst assigned to Plaintiff's case, performed DNA analysis of CM's underwear and testified at Plaintiff's trial. Id. at ¶¶ 4, 46-47. According to Jenkins, there was semen present in two distinct stains in CM's underwear, and CM was the major DNA contributor while Plaintiff was the minor DNA contributor. Id. at ¶ 46. Jenkins testified that there was a 1-in-290 chance that a Caucasian other than Plaintiff was the source of the semen. Id. Jenkins also testified that semen present in CM's underwear, not consistent with Plaintiff's DNA profile, contained inconclusive data. Id. Plaintiff alleges that Jenkins's report was "inaccurate and incomplete" because SERI's later analysis revealed that the DNA evidence used by Jenkins was "actually exculpatory," showing the presence of semen from two different men and that Jenkins's

12

faulty testimony contributed to Plaintiff's wrongful convictions. Id. at ¶¶ 47, 54, 61-63.

Plaintiff alleges that SERI analysts used the same techniques as Jenkins and determined that in CM's underwear there was semen from two distinct male contributors and Plaintiff was not one of the contributors. Id. at ¶ 61. Plaintiff alleges that the SERI records reflect that Jenkins mislabeled a portion of Plaintiff's DNA, although Jenkins asserts that she did not make a mistake in her initial DNA analysis and report. Id. at ¶¶ 62-63.

According to Plaintiff, if a "true report" had been provided to the defense, Plaintiff would have proven that CM lied about being a virgin, Plaintiff raping her, and Plaintiff giving her marijuana. Id. at ¶ 47. Plaintiff alleges that Jenkins "mistakenly or intentionally mischaracterized the DNA evidence in CM's underpants . . . to support and maintain the guilty verdict." Id. at ¶ 65.

Plaintiff alleges that Defendant Mark Gwyn, who was the Assistant Director of the Forensic Services Division at the time relevant to the complaint, was the final policymaker responsible for the actions of Jenkins and other subordinates. Id. at ¶¶ 5, 48, 64. Plaintiff alleges that Jenkins was trained and followed procedures set forth by Gwyn. Id. at ¶¶ 48, 64.

#### 4. Allegations Against Defendant Rhoton

Plaintiff alleges that Defendant Beth Rhoton, an officer with the Lewisburg Police Department, and other Lewisburg investigative officers did not take any physical evidence from Plaintiff's home "despite allegations that a child had been molested on" Plaintiff's bed. Id. at ¶¶ 6, 25. On August 16, 1999, Rhoton received a TBI report finding semen in CM's underwear. Id. at ¶ 35. Plaintiff alleges that Rhoton approached CM with this report and suggested to CM that Plaintiff had penile intercourse with CM. Id. at ¶¶ 19, 36. As a result, Rhoton obtained a signed statement from CM that Plaintiff had penile intercourse with her, after which Plaintiff was indicted for the

charge of rape of a child through penile penetration. Id. at ¶¶ 37-38.

During Rhoton's investigation, Plaintiff's son, Dale, told Rhoton that Dale had sexual intercourse with CM at some point in time. Id. at ¶ 40. Plaintiff alleges that Dale also told Rhoton that he and his brother were watching television with Plaintiff on the night of the alleged incident and that Rhoton became angry with Dale and told him not to tell anyone else this information. Id. Plaintiff also alleges that Rhoton did not investigate other adult males, including Robert Hodge and a registered sexual offender living near CM. Id. at ¶¶ 42, 45. Plaintiff alleges that Dale revealed this information to him in a letter after Plaintiff was incarcerated and shortly before Dale committed suicide on February 14, 2001. Id. at ¶ 41.

### 5. Allegations Against the City of Lewisburg and Marshall County

At his arraignment on March 18, 1999, Plaintiff was represented by now-deceased attorney Larry Wallace. Id. at ¶ 26. Following Plaintiff's March 18, 1999, indictment, Lewisburg and Marshall County administrators assigned Plaintiff's case to public defender Andrew Jackson Dearing, III. Id. at ¶ 27. Plaintiff alleges that the Tennessee Board of Professional Responsibility censured Dearing one year before representing Plaintiff. Id. at ¶ 28. Plaintiff alleges that Dearing was serving a six month probationary period during Plaintiff's trial, and that Dearing was censured again one year after representing Plaintiff. Id. at ¶¶ 29-30. Plaintiff alleges that Dearing told him that the public defender's office could not afford to analyze the DNA evidence despite there being procedures that the office could follow to analyze DNA. Id. at ¶ 50. Plaintiff also alleges that Dearing later testified that Plaintiff admitted guilt during their first meeting in March 1999 to all but the penile intercourse charge. Id. at ¶ 31. Plaintiff alleges that Dearing fabricated this testimony to refute Plaintiff's claim for ineffective assistance of counsel and to avoid a suspension of his law

14

license. Id. at ¶ 32. Plaintiff also alleges that Wallace corroborated Dearing's account by claiming that Plaintiff also admitted guilt to Wallace for all but the penile intercourse charge. Id. at ¶ 33.

Plaintiff alleges that the policies and practices of the Lewisburg Police Department and Marshall County District Attorney's Office caused "information obtained by the Defendants which was exculpatory, inconsistent with, or contradicted the defendants' theory of the case" to be withheld from Plaintiff's attorneys or not be recorded in official forms. Id. at ¶ 56.

## B. Conclusions of Law

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), a complaint "only survives a motion to dismiss if it 'contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" Courie v. Alcoa Wheel & Forged Prods., 577 F.3d 625, 629 (6th Cir. 2009) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). The Court must "construe the complaint in the light most favorable to the plaintiff, accept all its allegations as true, and draw all reasonable inferences in favor of the plaintiff." In re Travel Agent Comm'n Antitrust Litig., 583 F.3d 896, 903 (6th Cir. 2009) (citation omitted). However, the Court "need not accept as true legal conclusions or unwarranted factual inferences . . . and conclusory allegations or legal conclusions masquerading as factual allegations will not suffice." Id. at 903 (citations and quotation marks omitted).

In Iqbal, the Supreme Court explained the requirements for sustaining a motion to dismiss under Fed. R. Civ. P. 12(b)(6):

> Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." As the Court held in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), the pleading standard Rule 8 announces does not require "detailed factual allegations," but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation.

Id. at 555 (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)). A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." 550 U.S. at 555. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." Id. at 557.

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." Id. at 570. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Id. at 556. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Ibid. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" Id. at 557 (brackets omitted).

Two working principles underlie our decision in Twombly. First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. Id. at 555. . . . Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. Id. at 556. Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007). But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not "show[n]"—"that the pleader is entitled to relief." Fed. Rule Civ. Proc. 8(a)(2).

In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement of relief.

556 U.S. at 677-79.

As a general rule, "[a] motion under Rule 12(b)(6) is directed solely to a complaint itself . . . ." Sims v. Mercy Hosp. of Monroe, 451 F.2d 171, 173 (6th Cir. 1971). Yet, under Fed. R. Civ. P. 10(c), any matters attached to the pleadings are considered part of the pleadings as well as documents

that are referred to in the complaint or are "central" to the claim. Weiner v. Klais and Co., Inc., 108 F.3d 86, 89 (6th Cir. 1997); see also Jackson v. City of Columbus, 194 F.3d 737, 745 (6th Cir. 1999); Katt v. Titan Acquisitions, Ltd., 133 F. Supp.2d 632, 637 (M.D. Tenn. 2000) (citing Nieman v. NLO, Inc., 108 F.3d 1546, 1555 (6th Cir. 1997)). Such submissions do not convert a motion to dismiss into a motion for summary judgment where the evidence consists of proceedings in other courts of record. Rodic v. Thistledown Racing Club, Inc., 615 F.2d 736, 738 (6th Cir. 1980).

## 1. Defendants' Statute of Limitations Defense

Defendants Gwyn, Jenkins, Barnard, Rhoton, and the City of Lewisburg argue that Plaintiff's Fourth Amendment claims for false arrest/false imprisonment are barred by the applicable statute of limitations. Plaintiff contends that his false arrest/false imprisonment claims are timely because the limitation period did not accrue until the Tennessee Court of Criminal Appeals "overturned" Plaintiff's convictions on November 19, 2013. (Docket Entry No. 24 at 3).

The parties agree that the applicable period for federal civil rights actions in Tennessee is one year. Johnson v. Memphis Light Gas & Water Div., 777 F.3d 838, 843 (6th Cir. 2015); Tenn. Code Ann. § 28-3-104(a)(1)(B). The date of accrual for § 1983 claims is a question of federal law. Fox v. DeSoto, 489 F.3d 227, 233 (6th Cir. 2007). "Generally, a claim accrues 'when the plaintiff has a complete and present cause of action, that is, when the plaintiff can file suit and obtain relief.'" Panzica v. Corrections Corp. of America, 559 F.App'x 461, 463 (6th Cir. 2014) (quoting Wallace v Kato, 549 U.S. 384, 388 (2007)). The Sixth Circuit "typically determine[s] the accrual of a § 1983 action by 'look[ing] to the event that should have alerted the typical lay person to protect his or her rights.'" D'Ambrosio v. Marino, 747 F.3d 378, 384 (6th Cir. 2014) (quoting Cooey v. Strickland, 479 F.3d 412, 416 (6th Cir. 2007)).

17

The proper accrual date for § 1983 actions, however, also depends on the nature of the claim. Heck v. Humphrey, 512 U.S. 477 (1994); Wallace, supra. In Heck, a state prisoner "filed a § 1983 claim seeking damages for various constitutional violations that he alleged had occurred during his prosecution." Harrison v. Michigan, 722 F.3d 768, 771 (6th Cir. 2013) (citing Heck, 512 U.S. at 479). At issue was whether damages claims that "call into question the lawfulness of conviction or confinement" are cognizable under § 1983. Heck, 512 U.S. at 483. The Supreme Court held:

> [I]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254.

Id. at 486-87 (footnote omitted). Thus, Heck "established a delayed accrual date in cases involving challenges to an *invalid conviction or sentence* . . . ." Harrison, 722 F.3d at 772 (emphasis in original); Heck, 512 U.S. at 489-90 (citations omitted) ("Just as a cause of action for malicious prosecution does not accrue until the criminal proceedings have terminated in the plaintiff's favor, so also a § 1983 cause of action for damages attributable to an unconstitutional conviction or sentence does not accrue until the conviction or sentence has been invalidated.").

By contrast, in Wallace the Supreme Court considered the accrual date for an unlawful arrest claim. 549 U.S. at 386. The Supreme Court determined that the statute of limitations for "false imprisonment actions (including the sub-species of false arrest) . . . begins to run only when the alleged false imprisonment ends." Panzica, 559 F.App'x at 464 (citing Wallace, 549 U.S. at 388). The Supreme Court, however, held that "the statute of limitations upon a § 1983 claim seeking damages for a false arrest in violation of the Fourth Amendment, where the arrest is followed by

criminal proceedings, begins to run at the time the claimant becomes detained pursuant to legal process." Wallace, 549 at 397.

In Fox v. DeSoto, the Sixth Circuit explained the interplay between Wallace and Heck:

> Wallace clarifies the distinction between claims of malicious prosecution, such as the one addressed in Heck, and claims of false arrest and false imprisonment. . . . Heck held that a claim of malicious prosecution does not accrue until the underlying conviction is invalidated, 512 U.S. at 489-90, and this holding was reaffirmed in Wallace. 127 S.Ct. at 1098. The statute of limitations for a claim of false arrest, however, "where the arrest is followed by criminal proceedings, begins to run at the time the claimant becomes detained pursuant to legal process." Id. at 1100.

489 F.3d at 235.

Here, Plaintiff argues that Heck applies to all of his § 1983 claims, not just his malicious prosecution claim. Yet, Wallace governs Plaintiff's false arrest/false imprisonment claims given Plaintiff's alleged unlawful arrest and subsequent criminal proceedings. Thus, the Court concludes that under Wallace Plaintiff's Fourth Amendment false arrest/false imprisonment claims are barred by the one-year statute of limitations because he "bec[a]me[] detained pursuant to legal process" when he was arraigned and indicted in 1999. Wallace, 549 U.S. at 397. Accordingly, these Fourth Amendment claims should be dismissed as untimely.

Plaintiff alternatively contends that his false arrest/false imprisonment claim should be considered tolled until entry of the nolle prosequi order on April 4, 2014. Here, the nolle prosequi order merely foreclosed Plaintiff's potential re-prosecution and the Supreme Court in Wallace explained that potential future convictions do not toll the statute of limitations. 549 U.S. at 393; see also Fox, 489 F.3d at 235 ("[T]he possibility that [a] plaintiff's already-accrued § 1983 claims might impugn an anticipated future conviction d[oes] not trigger the Heck rule for deferred accrual.").

### 2. Official Capacity Claims Against Jenkins, Gwyn, and Barnard

Defendants Jenkins, Gwyn, and Barnard assert that Plaintiff's claims against them in their official capacities for money damages are barred under the Eleventh Amendment and because they are not "persons" under 42 U.S.C. § 1983.

An action against a state employee in his or her official capacity is an action against the State. Will v. Michigan Dept. of State Police, 491 U.S. 58, 71 (1989). Because a State is not a person who can be sued for monetary damages in a Section 1983 action, actions for money damages are barred against state officials in their official capacities, but not in their individual capacities. Kentucky v. Graham, 473 U.S. at 159, 167-68 (1985); McKormick v. Miami University, 693 F.3d 654, 662 (6th Cir. 2012).

Plaintiff does not dispute Defendants' contention, but states:

> Defendants Barnard, Jenkins, and Rhoton were each named in their individual capacities because Plaintiff seeks damages for intentional acts they engaged in to deprive Plaintiff of his rights. They were also named, along with Tennessee Bureau of Investigation ("TBI") Director Gwyn, in their official capacities, because Plaintiff seeks injunctive and declaratory relief against each of their offices.

(Docket Entry No. 24 at 4).

As Defendants Jenkins and Gwyn were state officials employed by the TBI, a state agency, the Court concludes that claims for money damages against Defendants Jenkins and Gwyn in their official capacities are barred by the Eleventh Amendment. See McKormick, 693 F.3d at 662; Rodgers v. Banks, 344 F.3d 587, 594 (6th Cir. 2003) (citation omitted) ("[T]he Eleventh Amendment bars § 1983 suits seeking money damages against states and against state employees sued in their official capacities.").

Defendant Barnard argues that all official capacity claims against him should also be

dismissed under the Eleventh Amendment. "Whether a county prosecutor is deemed a 'state official' depends, at least in part, on state law." Cady v. Arenac Cnty., 574 F.3d 334, 342 (6th Cir. 2009) (citing Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 280 (1977)). The office of District Attorney is created by state law. See Tenn. Code Ann. § 16-2-508. "Under Tennessee law, a county prosecutor is responsible for prosecuting 'all violations of the [Tennessee] criminal statutes,' therefore a suit brought against a county prosecutor responsible for enforcing criminal laws on behalf of the state of Tennessee is treated as a suit against Tennessee itself." Tiger v. Pynkala, No. 14-2312-JDT-dkv, 2014 WL 5502405, at *12 (W.D. Tenn. Oct. 30, 2014) (quoting Tenn. Code Ann. § 8-7-103(1)). As an Assistant District Attorney, Barnard was responsible for enforcing criminal laws on behalf of the State of Tennessee. Thus, the Court concludes that Barnard was a state official and Plaintiff's official capacity claims for money damages against Barnard are barred by the Eleventh Amendment. See McKormick, 693 F.3d at 662; Rodgers, 344 F.3d at 594; Tiger, 2014 WL 5502405, at *12.

### 3. Barnard

Defendant Barnard asserts absolute prosecutorial immunity to bar Plaintiff's damages claims against him in his individual capacity because all of Plaintiff's claims relate to Barnard's evaluation of evidence, his decision to prosecute, his preparation and presentation of the state's case, and his continued advocacy in post-conviction proceedings. Plaintiff alleges that "Barnard decided that he wanted a guilty conviction during his investigation of the charges against Plaintiff, then completely disregarded Plaintiff's clearly established constitutional rights in continuing the prosecution, despite clearly exculpatory evidence that he chose to withhold rather than present to Plaintiff as obligated." (Docket Entry No. 24 at 19). Plaintiff also alleges that Barnard purposefully elicited false or

misleading testimony from witnesses and coerced CM to present false testimony.

Prosecutors are "entitled to absolute immunity for performing functions 'intimately associated with the judicial phase of the criminal process.'" Adams v. Hanson, 656 F.3d 397, 401 (6th Cir. 2011) (quoting Imbler v. Pachtman, 424 U.S. 409, 430 (1976)). While prosecutorial immunity may "'leave the genuinely wronged defendant without civil redress against a prosecutor whose malicious or dishonest action deprives him of liberty,' [] affording any less protection would 'disserve the broader public interest' by preventing 'vigorous and fearless performance of the prosecutor's duty that is essential to the proper functioning of the criminal justice system.'" Ireland v. Tunis, 113 F.3d 1435, 1444 (6th Cir. 1997) (quoting Imbler, 424 U.S. at 427-28).

"[T]he official seeking absolute immunity bears the burden of showing that such immunity is justified . . . ." Burns v. Reed, 500 U.S. 478, 486 (1991). "Absolute prosecutorial immunity is not defeated by a showing that the prosecutor acted wrongfully or even maliciously." Grant v. Hollenbach, 870 F.2d 1135, 1138 (6th Cir. 1989). "[A]llegations of conspiracy do not abrogate a prosecutor's immunity . . . ." Shannon v. Johnson, No. 3:12-cv-01318, 2013 WL 1564223, at *3 (M.D. Tenn. April 12, 2013); see Imbler, 424 U.S. at 416-17, 427-29.

Absolute immunity attaches to specific functions rather than "the identity of the actor who performed" them. Buckley v. Fitzsimmons, 509 U.S. 259, 269 (1993) (citing Forrester v. White, 484 U.S. 219, 229 (1988)). Absolutely protected prosecutorial acts "include those 'undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State.'" Adams, 656 F.3d at 402 (quoting Buckley, 509 U.S. at 273). "Those acts must include the professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury after a decision to seek

an indictment has been made." Buckley, 509 U.S. at 273. By contrast, "[i]f the challenged actions of the prosecutor were not performed in his role as advocate, if they do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings, then only qualified immunity applies." Harris v. Bornhorst, 513 F.3d 503, 510 (6th Cir. 2008) (quoting Skinner v. Govorchin, 463 F.3d 518, 525 (6th Cir. 2006)). Thus, "[p]rosecutors are not absolutely immune when they perform administrative, investigative, or other functions . . . ." Holloway v. Brush, 220 F.3d 767, 774 (6th Cir. 2000). "[T]he critical inquiry is how closely related is the prosecutor's challenged activity to his role as an advocate intimately associated with the judicial phase of the criminal process." Ireland, 113 F.3d at 1443 (internal quotation marks omitted). "The analytical key to prosecutorial immunity, therefore, is *advocacy*—whether the actions in question are those of an advocate." Holloway, 220 F.3d at 775 (emphasis in original) (citations omitted).

The Sixth Circuit has noted that "[t]he line between conduct that is part of a preliminary investigation and conduct that is intimately associated with the judicial phase of a criminal proceeding is difficult to draw in some cases." Prince v. Hicks, 198 F.3d 607, 612 (6th Cir. 1999) (citation omitted). Nevertheless, a court must "focus on the specific conduct at issue in a case and determine whether a prosecutor was acting as an advocate for the state or whether she was simply engaging in preparatory conduct and performing administrative or investigative functions." Id.

Interviewing witnesses may be investigative acts and beyond prosecutorial immunity, as the Supreme Court stated:

> There is a difference between the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial, on the one hand, and the detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested, on the other hand. When a prosecutor performs the investigative functions normally performed by a detective or police

officer, it is neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other.

<u>Buckley,</u> 509 U.S. at 273 (citation and internal quotation marks omitted).

However, "[i]nvestigative acts undertaken in direct preparation of judicial proceedings, including the professional evaluation of evidence, warrant absolute immunity." <u>Ireland,</u> 133 F.3d at 1445. Yet, "other acts, such as the preliminary gathering of evidence that may ripen into a prosecution, are too attenuated to the judicial process to afford absolute protection." <u>Id.</u>

### a. Investigation

The underlying incident occurred on March 15, 1999, and Plaintiff was indicted and arraigned on March 18, 1999. Plaintiff does not challenge Barnard's decision to indict, but rather Barnard's "role in investigating the charges in conjunction with the other Defendants . . . ." (Docket Entry No. 24 at 18). Although Plaintiff generally alleges that Barnard was responsible for the actions of "those charged with investigating the underlying incident," (Docket Entry No. 1 at ¶ 3), the only specific allegations regarding Barnard's involvement with the investigation relate to his failure to investigate other potential suspects aside from Plaintiff. Plaintiff alleges:

> 42.    Robert Hodge, an adult male that Defendants Rhoton and Barnard knew was engaged in a sexual relationship with Jennifer, then a minor, was in CM's house at the time of the incident, but Defendants did not investigate Robert Hodge or test his DNA.

*    *    *

> 45.    Defendants Rhoton and Barnard were also aware that a registered sex offender lived several houses away from CM at the time of the alleged rape, but Defendants did not investigate the registered sex offender or investigate his DNA.

<u>Id.</u> at ¶¶ 42, 45.

Yet, Plaintiff's arrest and indictment was based on CM's account of the underlying incident to Rhoton, not Barnard's investigation (or lack thereof). Plaintiff specifically alleges:

24. On the night of the alleged incident, CM's account to police of what she had told Jennifer had occurred with Mr. Mills was different from the version recounted by Jennifer in a number of material ways.

25. Defendant Rhoton and the investigative officers employed by the City of Lewisburg took no physical evidence to investigate from Mr. Mills's home, despite allegations that a child had been molested on Mr. Mills's bed.

26. Mr. Mills cooperated with the Lewisburg police and turned himself over to police custody. Based on CM's allegations, Mr. Mills was promptly arraigned for providing drugs to a minor and engaging in digital and oral sexual contact with a minor on March 18, 1999. Mr. Mills was represented by attorney Larry Wallace, now deceased, at the arraignment.

\* \* \*

34. There were no allegations that Mr. Mills had engaged in penile intercourse with CM at any time Larry Wallace represented Mr. Mills, nor the time Dearing alleged the conversation between Mills and Dearing took place.

35. On August 16, 1999, Defendant Rhoton received a report from TBI that testing revealed the presence of semen in CM's underwear.

36. Defendant Rhoton approached CM with this information.

37. Defendant Rhoton obtained a written and signed statement from CM that Mr. Mills had engaged in penile intercourse with her and that she had not reported it previously because she was afraid she would get into trouble.

38. After obtaining CM's signed statement in August of 1999, new indictment documents for Mr. Mils were processed adding the charge of rape of a child through penile penetration on August 18, 1999.

Id. at ¶¶ 24-26, 34-38. If Barnard failed to investigate other potential suspects after the indictment, Barnard did so in his role as an advocate for the state preparing for criminal proceedings. Buckley, 509 U.S. at 272-73; Ireland, 113 F.3d at 1447 ("Absolute prosecutorial immunity will likewise attach

to administrative or investigative acts necessary for a prosecutor to initiate or maintain the criminal prosecution."); Gavitt v. Ionia Cnty., 67 F.Supp.3d 838, 857 (E.D. Mich. 2014) (quoting Latta v. Chapala, 221 Fed.Appx. 443, 444 (7th Cir. 2007)) ("[T]here is no constitutional duty to 'do a better investigation'; prosecutors may proceed on the basis of probable cause (all that is required for an indictment) and rely on defense counsel to marshal the evidence in defendants' favor.")

Accordingly, the Court concludes that Barnard's alleged failure to investigate other potential suspects was "intimately associated with the judicial phase of the criminal proceedings" and thus Defendant Barnard is entitled to absolute prosecutorial immunity as to this claim.

### b. Eliciting or Proffering False or Misleading Testimony

Plaintiff alleges that Barnard elicited false or misleading testimony on at least four occasions: (1) at trial, Barnard elicited testimony from Robert Hodge and Jennifer presenting their relationship as nonsexual despite Barnard's knowledge to the contrary, (Docket Entry No. 1 at ¶¶ 42-43); (2) on post-conviction, Barnard tried to undermine Jennifer's credibility because Jennifer testified that CM later admitted to lying about what happened on March 15, 1999, id. at ¶ 59; (3) on post-conviction, Barnard elicited false testimony from Plaintiff's defense attorneys that Plaintiff admitted guilt for all charges except penile intercourse, id. at ¶ 58; and (4) on his coram nobis motion, Barnard again proffered the false testimony of the defense attorneys even after the SERI DNA analysis, id. at ¶¶ 65-66. Plaintiff acknowledges that Barnard "would have prosecutorial immunity for his court-based conduct," but argues that "the Complaint draws attention to Barnard's courtroom behavior because his over-zealous advocacy reflects upon and supports Plaintiff's claims regarding Barnard's role in investigating the allegations levied against Plaintiff." (Docket Entry No. 24 at 18).

"As the [Supreme] Court concluded in Imbler, even the knowing presentation of false

testimony at trial is protected by absolute immunity." Spurlock v. Thompson, 330 F.3d 791, 797 (6th Cir. 2003) (citing Imbler, 424 U.S. at 413, 430). Since Imbler, "[p]rosecutorial decisions regarding witness testimony, including what witnesses to use at trial, and what questions to ask them, are activities intimately associated with the judicial phase of a criminal trial . . . ." Id. at 798 (citing Imbler, 424 U.S. at 413, 430; Buckley, 509 U.S. at 273); see also Wendrow v. Mich. Dep't of Human Services, 534 F.App'x 516, 530 (6th Cir. 2013) ("The distinction remains the prosecutor's function at the time of the malfeasance, rather than the falsification itself."). Accordingly, the Court concludes that absolute immunity applies to this alleged misconduct. See Spurlock, 330 F.3d at 798 ("Thompson's decision, as prosecuting attorney, to have Whitley and Apple testify falsely at Spurlock's second criminal trial, even if done knowingly, is protected by absolute immunity.").

### c. Withholding Exculpatory Evidence

Plaintiff alleges that Barnard withheld several items of information from Plaintiff's defense attorney during trial, including: (1) Defendant Jenkins's "actually exculpatory" DNA test results, (Docket Entry No. 1 at ¶ 49); (2) Plaintiff's son Dale's statement to Defendant Rhoton that he had sexual intercourse with CM on a prior occasion, id. at ¶¶ 40, 51; (3) that Robert Hodge was an adult in a sexual relationship with CM's minor sister Jennifer, id. at ¶ 52; and (4) that a registered sexual offender lived in CM's neighborhood at the time of the alleged incident, id. at ¶ 53. The extent to which this undisclosed information would have assisted Plaintiff in his defense is not relevant for prosecutorial immunity purposes. Even assuming that this evidence was exculpatory, "prosecutors have absolute immunity from civil liability for the non-disclosure of exculpatory information at trial." Koubriti v. Convertino, 593 F.3d 459, 467 (6th Cir. 2010) (citing Imbler, 424 U.S. at 431 n.34). Accordingly, based on Sixth Circuit precedents, the Court concludes that Barnard is entitled

27

to absolute immunity on these claims.

**d. Threatened Retaliation if CM Did Not Continue to Allege Plaintiff's Guilt**

Plaintiff alleges that CM continued to assert Plaintiff's guilt only because of Barnard's legal threats. (Docket Entry No. 1 at ¶¶ 15, 67, 79). Barnard argues that such activity is absolutely protected as preparation of witnesses for trial and out-of-court efforts to control the presentation of a witness's testimony. Plaintiff contends that "Barnard's actions forcing Plaintiff's accuser to maintain lies" are more in line with facts in Fields v. Wharrie, 740 F.3d 1107 (7th Cir. 2014), where the Seventh Circuit denied absolute prosecutorial immunity to the defendant. The Court disagrees.

In Fields, the prosecutor, acting as an investigator prior to the prosecution, was alleged to have fabricated evidence and introduced the fabricated evidence at trial. 740 F.3d at 1112-13. The Court stated that "[a] prosecutor cannot retroactively immunize himself from conduct by perfecting his wrong-doing through introducing the fabricated evidence at trial and arguing that the tort was not completed until a time at which he had acquired absolute immunity." Id. at 1114. Holding that this prosecutor was not entitled to absolute immunity, the Court distinguished between coercing witness testimony and fabricating testimony. Id. at 1112 (discussing Whitlock v. Brueggemann, 682 F.3d 567 (7th Cir. 2012) and Buckley v. Fitzsimmons, 20 F.3d 789, 794 (7th Cir. 1994) ("Coercing witnesses to speak, rather than loosening their tongues by promises of reward, is a genuine constitutional wrong, but the persons aggrieved would be [the coerced witnesses] rather than [the criminal defendant/Plaintiff]. Overbearing tactics violate the right of the person being interrogated to be free from coercion.")).

Yet, Barnard's actions differ from the prosecutor in Fields because Barnard is not alleged to have fabricated evidence or concocted CM's initial account of events, even though she later stated

28

that she lied.

In Spurlock v. Thompson, the Sixth Circuit addressed allegations of a prosecutor making coercive threats to witnesses. 330 F.3d at 798-99. There, the prosecutor "coerced [a witness] by threatening him to 'st[i]ck to his trial story' or be prosecuted for perjury . . . ." Id. at 798. The Court held that this coercive threat was not entitled to absolute immunity because it occurred after the conclusion of the plaintiff's adversarial criminal proceedings, during the course of an administrative investigation into the use of false testimony at the plaintiffs' trial and after plaintiff filed a federal civil rights action. Id. at 798-99. The Sixth Circuit stated that when the prosecutor "threatened retaliation against [the witness], [the prosecutor] was not doing so to prepare [the witness] as a trial witness or to make any professional evaluation of the evidence, but rather to hinder the investigation into the wrongdoing of himself and others, and to defeat [the plaintiffs'] civil rights suit." Id. at 799 (citation omitted). Yet, "[a]bsolute immunity applies to the adversarial acts of prosecutors during post-conviction proceedings, including direct appeals, habeas corpus proceedings, and parole proceedings, where the prosecutor is personally involved in the subsequent proceedings and continues his role as an advocate." Id. (citing Houston v. Partee, 978 F.2d 362, 365-66 (7th Cir. 1992)).

Here, Barnard's threats to CM are entitled to absolute prosecutorial immunity because they occurred during the course of Plaintiff's adversarial criminal proceedings and Barnard is not alleged to have fabricated CM's testimony. Barnard's alleged threats occurred after CM made the accusations against Plaintiff and well after Plaintiff was indicted. Plaintiff alleges that Barnard coerced CM to continue maintaining Plaintiff's guilt through the pendency of his criminal action with "legal threats"—presumably in the form of a potential perjury prosecution. Barnard's alleged

29

threats occurred while he was maintaining Plaintiff's guilt during the post-conviction appeals process. See id. at 799. Thus, the Court concludes that under Sixth Circuit precedent Barnard's alleged threats are entitled to absolute immunity because they were in the course of his advocacy for the state.

For these reasons, the Court concludes that Defendant Barnard is entitled to absolute prosecutorial immunity for all of the alleged misconduct that provides the bases for Plaintiff's claims against him. Accordingly, all of Plaintiff's claims against Barnard should be dismissed.

### 4. Claims Against Jenkins and Rhoton in their Individual Capacities

Defendants Jenkins and Rhoton contend that they are entitled to qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). In Pearson, the Supreme Court clarified that the two-prong test for qualified immunity requires Plaintiff to show that: (1) based upon the applicable law, the facts viewed in the light most favorable to the plaintiff show that a constitutional violation has occurred, and (2) the violation involved a clearly established constitutional right of which a reasonable person would have known. See Brown v. Lewis, 779 F.3d 401, 411-12 (6th Cir. 2015) (internal quotations omitted). "The court may address these prongs in any order, and if the plaintiff cannot make both showings, the officer is entitled to qualified immunity." Id. at 412 (citing Pearson, 555 U.S. at 236).

### a. Malicious Prosecution

Plaintiff asserts a Fourth Amendment malicious prosecution claim against Defendants

Jenkins and Rhoton in their individual capacities. (Docket Entry No. 1 at ¶ 93). Plaintiff's malicious prosecution claim accrued on November 19, 2013, <u>Mills v. State</u>, No. M2011-00620-CCA-R3-PC, 2013 WL 6069276 (Tenn. Crim. App. Nov. 19, 2013), when his convictions were reversed. <u>See</u> <u>Heck</u>, 512 U.S. at 489-90 (citations omitted) ("Just as a cause of action for malicious prosecution does not accrue until the criminal proceedings have terminated in the plaintiff's favor, so also a § 1983 cause of action for damages attributable to an unconstitutional conviction or sentence does not accrue until the conviction or sentence has been invalidated.") Here, Plaintiff timely filed this action on November 19, 2014.

"The Sixth Circuit 'recognize[s] a separate constitutionally cognizable claim of malicious prosecution under the Fourth Amendment,' which 'encompasses wrongful investigation, prosecution, conviction, and incarceration.'" <u>Sykes v. Anderson</u>, 625 F.3d 294, 308 (6th Cir. 2010) (quoting <u>Barnes v. Wright</u>, 449 F.3d 709, 715-16 (6th Cir. 2006)). To state his malicious prosecution claim, Plaintiff must allege plausible facts on the following elements:

(1) a criminal prosecution was initiated against the plaintiff and the defendant made, influenced, or participated in the decision to prosecute;

(2) there was no probable cause for the criminal prosecution;

(3) as a consequence of the legal proceeding, the plaintiff suffered a deprivation of liberty apart from the initial seizure; and

(4) the criminal proceeding was resolved in the plaintiff's favor.

<u>Robertson v. Lucas</u>, 753 F.3d 606, 616 (6th Cir. 2014) (citing <u>Sykes</u>, 625 F.3d at 308-09). Defendants contend that Plaintiff cannot satisfy the first two elements of this claim because these Defendants did not participate in the decision to prosecute and because there was probable cause.

As to the first element, "the term 'participated' should be construed within the context of tort

causation principles. Its meaning is akin to 'aided.' To be liable for 'participating' in the decision to prosecute, the officer must participate in a way that aids in the decision, as opposed to passively or neutrally participating." Webb v. United States, 789 F.3d 647, 660 (6th Cir. 2015) (quoting Sykes, 625 F.3d at 308 n.5) (internal quotation marks omitted). "[T]here must be some element of blameworthiness or culpability in the participation—albeit less than 'malice.' That is, truthful participation in the prosecution decision is not actionable." Johnson v. Moseley, 790 F.3d 649, 655 (6th Cir. 2015) (citing Sykes, 625 F.3d at 314).

As to the second element, probable cause to initiate a criminal prosecution exists where "the facts and circumstances are sufficient to lead a reasonable person to believe that the accused committed the particular offense with which he is to be charged." Mott v. Mayer, 524 F.App'x 179, 187 (6th Cir. 2013) (emphasis in original) (citation omitted) ("Whether probable cause exists to arrest a suspect is a distinct question from whether probable cause exists to prosecute an accused."). "[W]here there is probable cause to prosecute, a § 1983 action for malicious prosecution will not lie." McKinley v. City of Mansfield, 404 F.3d 418, 445 (6th Cir. 2005) (citations omitted). Generally, "the finding of an indictment, fair upon its face, by a properly constituted grand jury, conclusively determines the existence of probable cause." Webb, 789 F.3d at 660 (internal quotation marks omitted) (quoting Barnes, 449 F.3d at 716). Yet, "[a]n exception to this general rule applies when defendants knowingly or recklessly present false testimony to the grand jury to obtain the indictment." Id. (citations omitted).

### i. Defendant Jenkins

Defendant Jenkins contends that Plaintiff cannot establish his malicious prosecution claim against her because she did not influence or participate in the decision to prosecute Plaintiff and there

was probable cause for the prosecution. Plaintiff argues that Jenkins participated in the decision to prosecute Plaintiff based upon her DNA report. Specifically, Plaintiff alleges, in relevant part:

46.    Defendant Jenkins, the TBI DNA analyst assigned to the case, corroborated CM's story by reporting that she had found indicators of the presence of semen in two distinct stains in CM's underwear. According to Defendant Jenkins, there were two sources of DNA found in these areas: CM was the major contributor, and Mills's DNA profile was consistent with the minor contributor. Defendant Jenkins testified that Mr. Mills could not be excluded from the semen that was found in CM's underwear, and that there was a 1 in 290 chance that the semen came from any Caucasian other than Mr. Mills. Defendant Jenkins claimed that the segments of underwear containing semen other than the one she found to be consistent with Mr. Mills's DNA contained inconclusive data.

47.    Later expert analysis revealed that the DNA evidence used by Defendant Jenkins was actually exculpatory, and many of the semen results Defendant Jenkins termed "inconclusive" were actually conclusively someone else's DNA. The report that Defendant Jenkins presented was inaccurate and incomplete, and had a true report been provided to Mr. Mills and Dearing he would have been able to prove that DM had likely engaged in sexual relations with two other males on March 15, 1999, and that she had lied about her virginity as well as Mr. Mills raping her, fondling her, and providing her with marijuana.

\*    \*    \*

54.    Based on Defendant Jenkins' damning expert testimony of the incorrectly represented DNA evidence corroborating CM's trial narrative, Defendant Barnard was successful in eliciting a jury verdict finding Mr. Mills guilty of some, but not all, of the counts in the indictment on January 25, 2000.

\*    \*    \*

61.    Using the same analysis techniques as those used by Defendant Jenkins, the SERI results for the same sections of CM's underwear indicated the presence of semen from two different male contributors, and that Mr. Mills could not be the contributor of either of the two different male semen stains.

62.    SERI analysts also revealed that Defendant Jenkins had mislabeled a portion of Mills's DNA.

63.      A portion of Mr. Mills's DNA was mislabeled by Defendant Jenkins. Defendant Jenkins had testified that there was only a 0.3% chance that the DNA she had analyzed belonged to a Caucasian male other than Mr. Mills, despite clear evidence that CM's underwear contained semen from multiple men that was not Mr. Mills. Defendant Jenkins has nevertheless maintained that she did not make a mistake in her analysis and report.

64.      Defendant Jenkins was trained according to the policies and procedures set forth by Defendant Gwyn.

(Docket Entry No. 1 at ¶¶ 46-47, 54, 61-64).

On Plaintiff's "Motion to Reopen Post[-]Conviction Petition and Other Relief," the Tennessee Court of Criminal Appeals stated:

> We conclude that the Petitioner's claim of new scientific evidence in the form of new DNA evidence fails to present a claim under which a motion to reopen a post-conviction proceeding may be granted. While SERI was able to exclude the Petitioner as the contributor of the DNA in two places based on its testing, Jenkins was unable to exclude the Petitioner at the TH01 locus and concluded that the probability in an unrelated individual having the same DNA from the African/American population was approximately 1 in 270 and the probability in an unrelated individual having the same DNA from the Caucasian population was 1 in 290. At best, SERI's results merely call into question whether the Petitioner committed the offenses in this case but fall short of establishing by that the Petitioner was actually innocent of these charges. Accordingly, the Petitioner has not presented scientific evidence establishing his actual innocence and has not alleged any of the other statutory reasons for reopening a post-conviction proceeding.

Mills v. State, 2013 WL 6069276, at *20. Yet, the Tennessee appellate court also concluded:

> We agree with the Petitioner that the new DNA evidence undermines the victim's credibility not just as to the child rape—penile penetration charge but also as to all the charges for which the Petitioner was convicted. Consequently, we hold that a reasonable basis exists for concluding that had the new DNA evidence been presented at trial, the result of the proceedings on all of the charges might have been different.

Id. at *25.

Here, Jenkins's DNA report was not used as a basis for establishing probable cause for

Plaintiff's criminal prosecution. Plaintiff was initially indicted on March 18, 1999 for providing drugs to a minor and engaging in digital and oral sexual contact with a minor based upon CM's statements. (Docket Entry No. 1 at ¶¶ 24-27). According to Plaintiff's complaint, on August 16, 1999, Rhoton received a TBI report that reflected the presence of semen in CM's underwear. Id. at ¶ 36. Plaintiff alleges that Rhoton approached CM with this information, and CM provided a written statement that Plaintiff did engage in penile intercourse with CM. Id. at ¶¶ 36-37. Given the ambiguity as to whether this semen report included the DNA test results, the Court takes judicial notice of its records. Based upon this information, Plaintiff was indicted on August 18, 1999 on the additional charge of rape of a child through penile penetration. Id. at ¶ 38; see Mills v. Bell., 1:05-cv-00083 (M.D. Tenn.) (Docket Entry No. 33-1 at 39). On August 18, 1999, the same State court ordered the collection of blood and saliva samples of Plaintiff. Mills v. Bell., 1:05-cv-00083 (M.D. Tenn.) (Docket Entry No. 33-1 at 39). Thus, Jenkins's DNA test did not influence the second indictment.

CM's signed statement, not Jenkins's DNA test, supplied probable cause to prosecute Plaintiff. Plaintiff does not allege that Jenkins presented false testimony to the grand jury to obtain the indictment. "[T]he finding of an indictment, fair upon its face, by a properly constituted grand jury, conclusively determines the existence of probable cause." Webb, 789 F.3d at 660 (quoting Barnes, 449 F.3d at 716). Thus, the indictment established probable cause for Plaintiff's prosecution, and the Plaintiff's malicious prosecution claim against Jenkins should be dismissed.

### ii. Defendant Rhoton

Defendant Rhoton contends that Plaintiff fails to state his malicious prosecution claim because there was probable cause to prosecute Plaintiff and Plaintiff does not sufficiently allege that

Rhoton made, influenced, or participated in the decision to prosecute. Plaintiff argues that Rhoton failed to disclose exculpatory evidence uncovered in her investigation.

Plaintiff alleges that Rhoton investigated the March 1999 incident, but does not allege that Rhoton made or was consulted with regard to the decision to prosecute Plaintiff. The complaint specifically alleges that CM made statements implicating Plaintiff in the alleged crimes. "[A] crime victim's accusation standing alone can establish probable cause." Gardenhire v. Schubert, 205 F.3d 303, 322 (6th Cir. 2000) (citations omitted).

Further, as discussed above, Plaintiff's indictments, based upon the victim's statements, by the grand jury establishes the existence of probable cause, precluding Plaintiff's malicious prosecution claim. See Barnes, 449 F.3d at 716; see United States v. Angel, 355 F.3d 462, 475 (6th Cir. 2004) ("The government . . . has no judicially enforceable duty to provide a grand jury with exculpatory evidence.") (citing United States v. Williams, 504 U.S. 36, 47 (1992)). Plaintiff does not allege that Rhoton testified falsely before the second grand jury. Accordingly, the Court concludes that Plaintiff's malicious prosecution claim against Defendant Rhoton should be dismissed.

### b. **Brady** Claim

Plaintiff asserts that Defendants Barnard, Jenkins, and Rhoton manufactured "knowingly false inculpatory evidence" against Plaintiff and suppressed "exonerating exculpatory evidence," including Defendant Jenkins's DNA report that "clearly excluded [Plaintiff] but was labeled 'inconclusive.'" (Docket Entry No. 1 at ¶ 96). In his complaint, Plaintiff alleges:

> 48.  Defendant Jenkins alleges that she had followed standard protocols and procedures of the TBI Forensic Services Division, a department under the direction of Defendant Mark Gwyn.

* * *

64.    Defendant Jenkins was trained according to the policies and procedures set forth by Defendant Gwyn.

Id. at ¶¶ 48, 64. The Court construes this as a claim under Brady v. Maryland, 373 U.S. 83 (1963).

See Moldowan v. City of Warren, 578 F.3d 351, 379 (6th Cir. 2009) ("[A] criminal defendant is equally deprived of his or her due process rights when the police rather than the prosecutor suppresses exculpatory evidence because, in either case, the impact on the fundamental fairness of the defendant's trial is the same.").

In Brady, the Supreme Court held that the government is required to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment. 373 U.S. at 87. "There are three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281-82 (1999). In Kyles v. Whitley, 514 U.S. 419 (1995), the Supreme Court stated that Brady materials require disclosure of exculpatory and impeachment evidence, and such evidence must show that the result of the trial would have been different: "[F]avorable evidence is material, and **constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'**" 514 U.S. at 433 (quoting United States v. Bagley, 473 U.S. 667, 682, 685 (1985) (emphasis added)).

As stated previously, Defendant Barnard is entitled to absolute prosecutorial immunity for all of his alleged misconduct underlying Plaintiff's claims. See Koubriti, 593 F.3d at 467 (citing

Imbler, 424 U.S. at 431 n.34) ("[P]rosecutors have absolute immunity from civil liability for the non-disclosure of exculpatory information at trial."). Additionally, Plaintiff does not allege that Defendant Rhoton was involved in preparing the "exculpatory" DNA report and therefore Plaintiff's Brady claim against Defendant Rhoton should be dismissed.

As to Defendant Jenkins's DNA report, the Tennessee Court of Criminal Appeals held that "a reasonable basis exist[ed] for concluding that had the new DNA evidence been presented at trial, the result of the proceedings on all of the charges might have been different." Mills, 2013 WL 6069276, at *25. This conclusion qualifies under Brady as the record is unclear at this juncture as to whether her DNA report resulted in Plaintiff "receiv[ing] a fair trial, understood as a trial resulting in a verdict worthy of confidence." Kyles, 514 U.S. at 434. Yet, as reflected earlier in this Memorandum, the Tennessee appellate court reached its decision based upon findings that the "new DNA evidence" was based upon sperm fraction that Jenkins did not have, and additional DNA material that Jenkins did not have.

> Harmor testified that SERI's results showed that the Petitioner was excluded from the male DNA from unit 1–1, the sample from the waistband of the victim's underwear, and was excluded from the male DNA on unit 1–2, the sample from the crotch of the victim's underwear. He noted that he was able to identify more genetic material on the underwear than Jenkins. He also noted that Jenkins only drew "conclusions about the epithelial or non-sperm fraction of the crotch of the pair of panties and not the sperm fraction." Harmo[r] stated that he would have included the conclusions regarding the sperm fraction "to give a more complete result of the analysis." Regarding the one marker that Jenkins asserted could have been contributed by the Petitioner, Harmo[r] stated, "I would prefer to have looked at the electronic data and then analyzed it myself, with spreading the scale out, so that I could see what the peaks themselves looked like, to make sure they weren't artifacts." Finally, he opined that Jenkins had mistakenly identified the Petitioner's known sample as a 13, 14 rather than a 13, 13 at the D8S1179 locus and asserted that he had two results showing that the Petitioner was a 13, 13 at that locus.

* * *

38

Jenkins stated that when she lowered the baseline to between 50 and 150 RFU, she found no sperm fraction on the crotch area or the waistband area of the underwear at the TH01 locus. Although she acknowledged that SERI found an allele number 8 on the sperm fraction of the waistband in item 1–1 and the sperm fraction of the crotch of the panties in item 1–4, she stated that she was unable to find an 8 there. She explained that the difference could be because of the "technology, the sensitivity of their instruments" or because they may have been able to find something different because they had a different cutting or because of contamination. She said that after dropping the baseline, she still could not exclude the Petitioner at the locus TH01. Jenkins acknowledged that SERI found in the area D135317 alleles 12, 14 in item 1–1 that were male. She stated that SERI used these alleles to exclude the Petitioner because his known markers at that location were 8, 12. In addition, she noted that SERI found a 12, 14 in the sperm fraction for item 1–2 as male, which SERI used to exclude the Petitioner because his known markers at that location are 8, 12. In area D165539, SERI found alleles 9, 11 in item 1–2, which SERI used to exclude the Petitioner because his known markers at this location were 10, 13. Jenkins denied mistyping the Petitioner as a 13, 14 at the D8S1179 locus. She acknowledged that her testing produced very little DNA despite the fact that she had identified sperm and semen on the victim's underwear and that SERI's testing produced substantially more DNA in the non-sperm and sperm fractions in units 1–1 and 1–4. She also acknowledged that when she tested the underwear in 1999, she identified a lot of alleles that excluded the Petitioner, but she did not call them because she deemed them inconclusive. Jenkins said that after reviewing SERI's reports and data and after conducting additional analysis of her data, she stated that there was nothing that would change the testimony she gave at the Petitioner's trial.

*   *   *

We believe the new DNA evidence casts at least some doubt on the accuracy of Jenkins's results and calls into question not only whether the Petitioner committed the offense of rape of a child—penile penetration but also whether the Petitioner committed any of the charged offenses. . . . [T]he alleles that Jenkins stated were consistent with the Petitioner were found in the non-sperm fraction of the sample, rather than the sperm fraction of the sample. Moreover, Harmor stated that SERI was able to identify more genetic material on the underwear than Jenkins and that SERI's results showed that the Petitioner was excluded from the male DNA from unit 1–1, the sample from the waistband of the victim's underwear, and was excluded from the male DNA on unit 1–2, the sample from the crotch of the victim's underwear. We agree with the Petitioner that the new DNA evidence undermines the victim's credibility not just as to the child rape—penile penetration charge but also as to all the charges for which the Petitioner was convicted. Consequently, we hold that a reasonable basis exists for concluding that had the new DNA evidence been

presented at trial, the result of the proceedings on all of the charges might have been different.

Mills, 2013 WL 6069276 at **23-25 (internal citation omitted) (emphasis added).

To be sure, technicians can be liable for a Brady claim. See Gregory v. City of Louisville, 444 F.3d 725, 744-45 (6th Cir. 2006) (denying a defendant-lab technician's interlocutory appeal of a district court's denial of qualified immunity at summary judgment from Brady claims where the plaintiff alleged that the lab technician "deliberately withheld the existence of two nonmatching hairs" while the "forensic report showed only 5 hairs, all of which [the lab technician] 'matched' with Plaintiff"). As the Sixth Circuit explained in Moldowan:

> In Gregory, we reasoned that expert forensic examiners "act in an investigatory fashion when they interpret and document physical evidence," and thus we determined that "the intentional fabrication of a forensic report" is subject to the same considerations applied to the intentional fabrication of evidence by a police officer or prosecutor. 444 F.3d at 740. Under that framework, Gregory concluded that a forensic expert may be subject to suit under § 1983 for deliberately withholding the existence of exculpatory forensic evidence or fabricating forensic evidence. Id. at 744. Relying on Spurlock v. Satterfield, 167 F.3d 995, 1005 (6th Cir. 1999), Gregory reaffirmed that a forensic expert defendant "cannot seriously contend that a reasonable [investigator] would not know that such actions were inappropriate and performed in violation of an individual's constitutional . . . rights." Gregory, 444 F.3d at 744 (quoting Spurlock, 167 F.3d at 1005) (alteration in Gregory). Gregory's reliance on Spurlock is significant because we determined in that case that this legal norm was clearly established at least as early as April or May of 1990. Spurlock, 167 F.3d at 998-99, 1006.

578 F.3d at 397 (internal quotation marks omitted).

Yet, based upon the Tennessee appellate court findings, at the time of Plaintiff's trial, there was only one DNA test, Jenkins's test. Thus, there was not any exculpatory DNA evidence to withhold. The "new DNA evidence" that exculpated Plaintiff was based on "sperm fraction" material that Jenkins did not have and the additional DNA material that Jenkins did not have. Plaintiff's DNA

expert testified that Jenkins "mistakenly identified" Plaintiff, which is not a deliberate decision to withhold evidence. Mills, 2013 WL 6069276, at *23.

### 5. Equal Protection

Because the Court concludes that Defendant Barnard's acts are entitled to absolute prosecutorial immunity, Plaintiff's equal protection claim should be dismissed against Defendant Barnard. As to Defendants Jenkins and Rhoton, these Defendants contend, in essence, that Plaintiff fails to state an equal protection claim because there are not any plausible factual allegations that similarly situated persons were treated differently. In response, Plaintiff argues that "[w]hile a portion of Plaintiff's Complaint unartfully attributed Plaintiff's Equal Protection rights to the wrong Constitutional Amendment and statute, this was a harmless error as the Complaint still substantively and expressly contains a 'class of one' discrimination claim." (Docket Entry No. 24 at 11).

"An equal protection claim must assert that the plaintiff suffered class-based discrimination." Herron v. Harrison, 203 F.3d 410, 417 (6th Cir. 2000) (citations omitted). Plaintiff argues that he qualifies for discrimination as a "class of one." Because "the concept of a class-of-one equal protection claim could effectively provide a federal cause of action for review of almost every executive and administrative decision made by state actors," Loesel v. City of Frankenmuth, 692 F.3d 452, 462 (6th Cir. 2012) (quoting Jennings v. City of Stillwater, 383 F.3d 1199, 1210-11 (10th Cir. 2004)), the Sixth Circuit has stated that "a plaintiff must overcome a 'heavy burden' to prevail based on the class-of-one theory," id. (citing TriHealth, Inc. v. Bd. of Comm'rs Hamilton Cnty., Ohio, 430 F.3d 783, 791 (6th Cir. 2005)). A valid class-of-one claim "must allege 'that [she or he] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" Franks v. Rubitschun, 312 F.App'x 764, 766 (6th Cir. 2009)

(quoting Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000)). To survive a Rule 12(b)(6) motion to dismiss, a plaintiff's complaint "must contain enough factual matter to plausibly show there was not '**any** conceivable basis' that rationally supported" the defendants' actions. See Rapp v. Dutcher, 557 F.App'x 444, 449-50 (6th Cir. 2014) (citing TriHealth, Inc., 430 F.3d at 790) (emphasis in original).

Plaintiff contends that Plaintiff was treated differently from similarly situated persons because "potential suspects were not even investigated despite the evidence exculpating Plaintiff," citing Plaintiff's son Dale, Robert Hodge, and an unnamed registered sexual offender who lived in CM's neighborhood. (Docket Entry No. 24 at 11 (citing Docket Entry No. 1 at ¶¶ 40-45)). Yet, Plaintiff was not similarly situated to these "potential suspects" because CM did not make accusations against any of them. Plaintiff "[has] the burden of demonstrating that [he was] treated differently than other potential suspects "who were similarly situated in **all material respects**." Loesel, 692 F.3d at 462 (citations omitted) (emphasis added). Thus, CM's accusations against Plaintiff provided Defendants a "conceivable basis" for treating Plaintiff differently than other "potential suspects." See Rapp, 557 F.App'x at 449-50. Further, once probable cause was established by CM's statements, "the police have no constitutional duty to investigate further or to seek potentially exculpatory evidence." Martin v. Maurer, 581 F.App'x 509, 512 (6th Cir. 2014) (citation omitted).

Accordingly, the Court concludes that Plaintiff's equal protection claim should be dismissed.

### 6. Conspiracy Claims Under Sections 1983 and 1985 Against Jenkins and Rhoton

Plaintiff asserts claims for conspiracy to violate his constitutional rights. Defendants contend, in sum, that Plaintiff's complaint fails to allege any facts with specificity that would support a claim

for conspiracy and that Plaintiff has failed to allege that he was a member of a constitutionally protected class for his § 1983 claim. For his conspiracy claims, Plaintiff alleges that "Defendants Barnard, Jenkins, and Rhoton, with Dearing and other investigative, supervisory, and command personnel, together and under color of law, reached an understanding, engaged in a course of conduct, and otherwise conspired among and between themselves to deprive Mr. Mills of his constitutional rights . . . ." (Docket Entry No. 1, Complaint, at ¶ 95). Plaintiff also alleges that:

> In furtherance of this conspiracy or conspiracies, the defendants named above, together with their un-sued co-conspirators, committed the overt acts set forth in the facts set forth above, including, but not limited to, the wrongful arrest, imprisonment and prosecution of Mr. Mills; the manufacture by the methods articulated above of knowingly false inculpatory evidence against Mr. Mills; the suppression of exonerating exculpatory evidence, including, but not limited to the DNA evidence that clearly excluded Mr. Mills but was labeled as "inconclusive," the failure to investigate Robert Hodge, Dale Mills, or any other likely suspects either at the time they received or after it became known there was no scientific or physical evidence that linked Mr. Mills to the alleged crime, the psychological coercion of CM in an attempt to compel her to make false inculpatory statements against Mr. Mills; the making of known misstatements and the presentation of this knowingly false and incomplete evidence to prosecutors, judges, juries, and appellate courts; and the filing of false and incomplete statements and reports.

Id. at ¶ 96. Plaintiff's complaint does not contain any factual allegations of an agreement between Defendant Jenkins and her supervisor, Defendant Gwyn, nor does it contain any allegations that Defendant Gwyn reviewed or adopted Defendant Jenkins's report. The only factual allegations connecting Defendant Jenkins and Defendant Gwyn are the following:

> 48.    Defendant Jenkins alleges that she had followed standard protocols and procedures of the TBI Forensic Services Division, a department under the direction of Defendant Mark Gwyn.

*   *   *

> 64.    Defendant Jenkins was trained according to the policies and procedures set forth by Defendant Gwyn.

Id. at ¶¶ 48, 64.

In Hooks v. Hooks, 771 F.2d 935 (6th Cir. 1985), the Sixth Circuit established the

standard for §1983 conspiracy claims:

> A civil conspiracy is an agreement between two or more persons to injure another by
> unlawful action. Express agreement among all the conspirators is not necessary to
> find the existence of a civil conspiracy. Each conspirator need not have known all of
> the details of the illegal plan or all of the participants involved. All that must be
> shown is that there was a single plan, that the alleged coconspirator shared in the
> general conspiratorial objective, and that an overt act was committed in furtherance
> of the conspiracy that caused injury to the complainant.

Spadafore v. Gardner, 330 F.3d 849, 854 (6th Cir. 2003) (quoting Hooks, 771 F.2d at 943-44). To

state a claim for conspiracy under 42 U.S.C. § 1983, a plaintiff must allege "'that (1) a single plan

existed, (2) the conspirators shared a conspiratorial objective to deprive the plaintiffs of their

constitutional rights, and (3) an overt act was committed.'" Womack v. Conley, 595 F.App'x 489,

494 (6th Cir. 2014) (quoting Revis v. Meldrum, 489 F.3d 273, 290 (6th Cir. 2007)). "It is well-

settled that conspiracy claims must be pled with some degree of specificity and that vague and

conclusory allegations unsupported by material facts will not be sufficient to state such a claim under

§ 1983." Gutierrez v. Lynch, 826 F.2d 1534, 1538 (6th Cir. 1987). Thus, "pleading requirements

governing civil conspiracies are relatively strict." Fieger v. Cox, 524 F.3d 770, 776 (6th Cir. 2008)

(citation omitted).

The only two paragraphs in which Plaintiff references conspiracy consist primarily of legal

conclusions. A court is not required to accept legal conclusions or unwarranted factual inferences

as true. Jones v. City of Cincinnati, 521 F.3d 555, 559 (6th Cir. 2008). Plaintiff's complaint is devoid

of any specific factual allegations of a plan or agreement by Defendants to violate Plaintiff's

constitutional rights. Plaintiff fails to allege with factual specificity an agreement by Defendants Rhoton or Gwyn to engage in unlawful action. Thus, Plaintiff's "failure to plead a plan or agreement to violate his constitutional rights is fatal to his conspiracy claim." Heyne v. Metro. Nashville Pub. Sch., 655 F.3d 556, 564 (6th Cir. 2011) (citing Mettetal v. Vanderbilt Univ., Legal Dep't, 147 F.App'x 577, 585 (6th Cir. 2005) (concluding that a district court correctly dismissed certain conspiracy claims for failure to allege that the parties had entered into an agreement or formed a single plan); Huffer v. Bogan, 503 F.App'x 455, 462 (6th Cir. 2012) (holding that the plaintiff failed to state a conspiracy claim where the plaintiff's conspiracy claim "merely described the actions taken by various individual defendants, asserting that their actions were taken in furtherance of a conspiracy," as the plaintiff's claim was deemed conclusory and failed "to include allegations regarding an agreement or shared plan between the individual defendants to violate his civil rights"); Trans Rail Am., Inc. v. Hubbard Twp., 478 F.App'x 986, 988 (6th Cir. 2012) (affirming the district court's conclusion that "there are no factual allegations that would support the conclusory statements that each of the defendants conspired with one another," the Sixth Circuit stated that the amended complaint's "insurmountable flaw [was] that it fail[ed] to plead facts showing the existence of 'a single plan'"). Accordingly, the Court concludes that Plaintiff's allegations regarding Defendants' participation in a conspiracy are "vague and conclusory" and therefore insufficient to state a § 1983 conspiracy claim. See Guitierrez, 826 F.2d at 1538. Moreover, to the extent that the individual Defendants participated in his convictions, "[a] claim for civil conspiracy under § 1983 exists only where the plaintiff has established a separate and actionable constitutional injury." Rapp, 557 F.App'x at 450 (citing Bauss v. Plymouth Twp., 233 F.App'x 490, 500 (6th Cir. 2007)). Plaintiff has not established an underlying constitutional injury. The Court concludes that Plaintiff's §§ 1983 and

1985(3) conspiracy claims should be dismissed. See id.

Finally, as to his conspiracy claim under § 1985(3), Plaintiff must prove:

(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges or immunities of the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

Vakilian v. Shaw, 335 F.3d 509, 518 (6th Cir. 2003) (quoting United Bhd. of Carpenters & Joiners v. Scott, 463 U.S. 825, 828-29 (1983)). "The acts that allegedly 'deprived the plaintiff of equal protection must be the result of class-based discrimination.'" Coker v. Summit Cnty. Sheriff's Dep't, 90 F.App'x 782, 789 (6th Cir. 2003) (quoting United Bhd., 463 U.S. at 828-29); Center for Bio-Ethical Reform, Inc. v. City of Springboro, 477 F.3d 807, 832 (6th Cir. 2007) ("A § 1985(3) complaint must 'allege both a conspiracy and some class-based discriminatory animus behind the conspirators' action.' Newell v. Brown. 981 F.2d 880, 886 (6th Cir. 1992). . . . Plaintiffs here do not allege that Defendants acted with discriminatory animus based on a constitutionally protected *classification*.") (emphasis in original) (citing Dunn v. Tennessee, 697 F.2d 121, 124 (6th Cir. 1982)).

Here, Plaintiff does not allege that the Defendants' alleged violations were the result of race or class-based discrimination. Even if Plaintiff qualified as a "class of one," the Sixth Circuit has stated that membership in a class of one is "'not entitled to the kind of special protection which would make § 1985(3) applicable . . . .'" Royal Oak Entm't, LLC v. City of Royal Oak, Mich., 205 F.App'x 389, 399 (6th Cir. 2006) (quoting McGee v. Schoolcraft Cmty. Coll., 167 F.App'x 429, 436 (6th Cir. 2006)). Thus, the Court concludes that Plaintiff's § 1985 conspiracy claim should be dismissed because Plaintiff did not suffer class-based discrimination. See Coker, 90 F.App'x at 789;

<u>Umani v. Mich. Dept. of Corr.</u>, 432 F.App'x 453, 462 (6th Cir. 2011).

## 7. Access to Courts Claim

Plaintiff alleges that Defendants Barnard,[4] Jenkins,. and Rhoton deprived him of his constitutional "right to access to the Courts, as protected by the First, Fourth, and Fourteenth Amendments to the United States Constitution and 42 U.S.C § 1983." (Docket Entry No. 1 at ¶ 95).

"The Supreme Court has recognized a constitutional right of access to the courts, whereby a plaintiff with a nonfrivolous legal claim has the right to bring that claim to a court of law." <u>Flagg v. City of Detroit</u>, 715 F.3d 165, 173 (6th Cir. 2013) (citing <u>Christopher v. Harbury</u>, 536 U.S. 403, 415 n.12 (2002)). "[T]he right [of access to the courts] is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." <u>Brown v. Matauszak</u>, 415 F.App'x 608, 612 (6th Cir. 2011) (citation omitted). As the Sixth Circuit recently explained, "[d]enial of access to the courts claims may be 'forward-looking' or 'backward-looking.'" <u>Flagg</u>, 715 F.3d at 173 (citing <u>Christopher</u>, 536 U.S. at 415). "In forward-looking claims, the plaintiff accuses the government of creating or maintaining some 'frustrating condition,' that stands between the plaintiff and 'the courthouse door.' The object of the suit is to eliminate the condition, thereby allowing the plaintiff, usually an inmate, to sue on some underlying legal claim." <u>Id.</u> (citations omitted). In contrast, "[i]n backward-looking claims, . . . the government is accused of barring the courthouse door by concealing or destroying evidence so that the plaintiff is unable to ever obtain an adequate remedy on the underlying claim." <u>Id.</u> (citing <u>Christopher</u>, 536 U.S. at 413-14). Although much less established than forward-looking claims, this Circuit recognizes backward-looking claims.

---

[4]As discussed <u>supra</u>, Plaintiff's claims against Barnard are barred by absolute prosecutorial immunity.

Id.; see also Hunt v. City of Cleveland, 563 F.App'x 404, 410 (6th Cir. 2014). The Court construes Plaintiff's claim as backward-looking.

"In a denial-of-access case, 'the underlying cause of action and its lost remedy must be addressed by allegations in the complaint sufficient to give fair notice to a defendant,' just '[l]ike any other element of an access claim.'" Brown, 415 F.App'x at 612 (citations omitted). In Christopher, the Supreme Court stated:

> [T]he underlying cause of action, whether anticipated or lost, is an element that must be described in the complaint, just as much as allegations must describe the official acts frustrating the litigation. It follows, too, that when the access claim . . . looks backward, the complaint must identify a remedy that may be awarded as recompense but not otherwise available in some suit that may yet be brought. There is, after all, no point in spending time and money to establish the facts constituting denial of access when a plaintiff would end up just as well off after litigating a simpler case without the denial-of-access element.

> * * *

> Although we have no reason here to try to describe pleading standards for the entire spectrum of access claims, this is the place to address a particular risk inherent in backward-looking claims. Characteristically, the action underlying this sort of access claim will not be tried independently, a fact that enhances the natural temptation on the part of plaintiffs to claim too much, by alleging more than might be shown in a full trial focused solely on the details of the predicate action.

> Hence the need for care in requiring that the predicate claim be described well enough to apply the "nonfrivolous" test and to show that the "arguable" nature of the underlying claim is more than hope. And because these backward-looking cases are brought to get relief unobtainable in other suits, the remedy sought must itself be identified to hedge against the risk that an access claim be tried all the way through, only to find that the court can award no remedy that the plaintiff could not have been awarded on a presently existing claim.

536 U.S. at 415-16 (footnotes omitted).

"Essentially, a claim for denial of access to the courts has unique pleading requirements: a plaintiff must plead a case within a case, alleging the law and facts sufficient to establish both the

48

interference with his access to the courts, and the non-frivolous nature of the claim that was lost." Brown, 415 F.App'x at 612. As stated by the Sixth Circuit, the elements of a backward-looking denial of access-to-court claims are: "(1) a non-frivolous underlying claim; (2) obstructive actions by state actors; (3) substantial prejudice to the underlying claim that cannot be remedied by the state court; and (4) a request for relief which the plaintiff would have sought on the underlying claim and is now otherwise unattainable." Flagg, 715 F.3d at 174 (internal punctuation and citations omitted). "Plaintiffs must make out the denial-of-access elements against each defendant in conformance with the requirements of § 1983." Id.

As to his access-to-courts claim, Plaintiff complaint alleges: "To date, a basic background check of Mr. Mills still indicates that he was convicted of rape of a child, aggravated sexual battery, and casual exchange, making it extremely difficult for Mr. Mills to earn gainful employment." (Docket Entry No. 1, Complaint, at ¶ 86). In his response to Defendants' motions to dismiss, Plaintiff argues: "Defendants Marshall County and Barnard have continued to block Plaintiff's efforts to expunge [his] charges and conviction from his record despite his rights under Tennessee law." (Docket Entry No. 24 at 14). As to injunctive relief, Plaintiff states:

> Plaintiff seeks an injunction clearing his criminal record. Plaintiff's efforts to do so through the Marshall County court system pursuant to Tenn. Code Ann. § 40-32-101 have not progressed, likely due to Defendants Barnard and Marshall County's intent to continue to deprive Plaintiff of his rights in any manner at their disposal. Plaintiff is entitled to have his name restored and these heinous charges and convictions removed from his background check. Tennessee criminal background checks are conducted by TBI, which is under the direction of [Defendant] Gwyn. Defendants will not comply with the law when it comes to restoring Plaintiff's rights that their actions stripped away, and they must be enjoined from continuing to do so.

Id. at 7.

Tennessee Code Ann. § 40-32-101(a)(3) provides: "Upon petition by a defendant in the court

49

that entered a nolle prosequi in the defendant's case, the court shall order all public records expunged." Based upon his allegations, to the extent Plaintiff asserts an injury to his name, where state law provides a remedy, there is not a federal claim. Paul v. Davis, 424 U.S. 693, 701-02 (1976). The Supreme Court has held that, where a plaintiff has a remedy against government officials under state law, the plaintiff does not state a cognizable claim under the Due Process Clause. Parratt v. Taylor, 451 U.S. 527, 543-44 (1981) (overruled on other grounds by Daniels v. Williams, 474 U.S. 327 (1986)). "While the states are, of course, free to enact laws that are more protective of individual rights than the United States Constitution, a mere violation of such a state law will not establish a proper claim under § 1983." Pyles v. Raisor, 60 F.3d 1211, 1215 (6th Cir. 1995) (citation and internal quotation marks omitted). The Fourteenth Amendment should not be "superimposed upon whatever systems may already be administrated by the States." Daniels, 474 U.S. at 332 (citations and internal quotation marks omitted). "[A]n unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available." Hudson v. Palmer, 468 U.S. 517, 533 (1984). To the extent the Plaintiff alleges loss of property such as income, the Tennessee Governmental Tort Liability Act provides a remedy for the loss of property interest. See Tenn. Code Ann. § 29-20-101 et seq.

Here, Plaintiff has failed to allege with particularity facts to establish the elements of his access-to-courts claim. Plaintiff does not allege any underlying claims lost as a result of any Defendant's conduct or that cannot be remedied by this Court. Nor does Plaintiff allege sufficient facts as to why any relief he would have sought on an underlying claim is now unattainable or why

he is now foreclosed from bringing the underlying claim.[5] Accordingly, the Court concludes that Plaintiff's denial-of-access claim should be dismissed.

## 8. Marshall County and the City of Lewisburg

Plaintiff also asserts claims for municipal liability against Marshall County and the City of Lewisburg. Of the individual Defendants, only Defendant Rhoton was a local government employee. To raise a municipal liability claim under § 1983, Plaintiff must demonstrate that the alleged federal violation occurred because of a municipal policy or custom. Burgess v. Fischer, 735 F.3d 462, 478 (6th Cir. 2013) (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978)). "There can be no Monell municipal liability unless there is an underlying unconstitutional act." Wilson v. Morgan, 477 F.3d 326, 340 (6th Cir. 2007) (citing City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986)). Because the Court has concluded that there are not any underlying constitutional violations by Defendant Rhoton, the only city or county employee, the Court concludes that Marshall County and the City of Lewisburg are not subject to municipal liability and should be dismissed as Defendants. Id.

## 9. Declaratory and Injunctive Relief

As to Plaintiff's request for injunctive relief, the individual Defendants may not be sued for injunctive relief in their individual capacities. See Cmty. Mental Health Servs. of Belmont v. Mental Health and Recovery Bd. Serving Belmont, Harrison & Monroe Cntys., 150 F.App'x 389, 401 (6th Cir. 2005). As to Plaintiff's allegations on the continued publication of his conviction that has been

---

[5]Although Plaintiff's Fourth Amendment false arrest and false imprisonment claims are barred by the statute of limitations, as a matter of law, Plaintiff was required to file these claims within a year from the time he became detained pursuant to legal processes, and Plaintiff does not allege that any Defendant prevented him from filing these claims.

set aside, as stated above, Tennessee law provides a remedy. As to Defendants in their official capacities, Plaintiff cannot enjoin Defendants from things they have allegedly already done. If Plaintiff is seeking to enjoin Defendants from future acts, Plaintiff lacks standing. See Hearring v. Sliwowski, 806 F.3d 864, 868 (6th Cir. 2015). Accordingly, Plaintiff's claim for injunctive relief should be denied.

For the reasons stated on Plaintiff's access-to-courts claim, Plaintiff has viable state remedies and in such a situation, Plaintiff is not entitled to declaratory or injunctive relief.

### C. Conclusion

Without any viable federal claims, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law false imprisonment claim. See e.g., Wal-Juice Bar, Inc. v. Elliot, 899 F.2d 1502, 1504 (6th Cir. 1990). For these collective reasons, the Court concludes that the motions to dismiss of Defendants Jenkins and Gwyn (Docket Entry No. 6), Defendant Barnard (Docket Entry No. 13), Defendant Marshall County (Docket Entry No. 16), and Defendants Rhoton and the City of Lewisburg (Docket Entry No. 18) should be granted, except that Plaintiff's state law claim should be dismissed without prejudice. For his wrongful conviction, Plaintiff's potential remedies are in the state courts.

An appropriate Order is filed herewith.

**ENTERED** this the ⟨30⟩ day of September, 2016.

WILLIAM J. HAYNES, JR.
Senior United States District Judge